Scott D. Righthand, Esq., SBN: 087635
Brittany Rogers, Esq., SBN: 288522
THE LAW OFFICE OF SCOTT RIGHTHAND
A Professional Corporation
425 California Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 544-0115
Facsimile:   (415) 544-0116
Scott@righthandlaw.net
Brittany@righthandlaw.net

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DONALD LOEBER and MARIE LOEBER by and through her Successor In Interest, MICHELLE LOEBER,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.: 3:21-CV-03866-LB<br><br>**DECLARATION OF LARRY D. YOUNGNER IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS**<br><br>Date:    August 22, 2024<br>Time:   9:30 a.m.<br>Dept.:   Courtroom B – 15th Floor<br><br>Honorable Judge Beeler<br>United States Magistrate Judge |

I, Larry D. Youngner, J.D., LL.M., declare as follows:

1.      I am over the age of eighteen.

2.      I have personal knowledge of the facts stated herein, and if called to testify with respect thereto, could, and would do so competently under oath.

3.      I am currently self-employed. I am the Founding Partner and Chief Executive Officer of Warrior Counsel, LLC. Warrior Counsel is a federal law consulting firm and national security law firm based in Cape Coral, Florida since January 10, 2020. Warrior Counsel, LLC represents federal

employees, veterans, active duty and reserve component military members on federal administrative law matters before federal courts, boards and agencies. Warrior Counsel also provides expert consultation to clients on federal administrative law matters focused on U.S. veteran matters and U.S. national security.

4.      Prior to founding Warrior Counsel, LLC, I was employed as an attorney by the Tully Rinckey, PLLC Law Firm from July, 2014 until January, 2020. In July 2014, I was a Partner leading the firm's Military Law and National Security Law Practice Group. In 2014 I received Department of Veterans Affairs (VA) accreditation as an attorney to assist a veteran claimant on the preparation, submission, and pursuit of a claim for VA benefits. I continued to represent VA claimants until 2019. In January, 2015, I became the Managing Partner of the firm's Washington, DC office of 19 attorneys and 6 support staff. From May, 2016 until January, 2020, I worked as Of Counsel with the firm. During my tenure with Tully Rinckey, PLLC, I represented clients on a diverse array of federal administrative law and criminal law matters before federal courts, administrative boards, and agencies to include the VA, Department of Justice (DOJ), Department of Defense (DoD), National Geospatial Intelligence Agency (NGIA), Central Intelligence Agency (CIA), and the Defense Office of Hearings and Appeals (DOHA). During this time, I was an invited speaker for the media and the Air Force Annual Survey of the Law on military criminal law and administrative law matters.

5.      Prior to joining the Tully Rinckey, PLLC Law Firm, I served as a commissioned officer in the U.S. Army and U.S. Air Force (USAF) for nearly 31 years from June, 1983 until June, 2014. While in the Army, I served as a Medical Service Corps (MSC) Officer from May 1986 until November 1989. As an MSC, I served as an ambulance platoon leader and medical personnel officer.

6.      I transferred to the USAF as a Judge Advocate General Corps (JAG) Officer (military lawyer) in November, 1989 where I served on continuous active duty for 25 years until retirement in

July, 2014. As an Air Force JAG, I advised unit and installation commanders on administrative law at every echelon of the service: squadron, group, wing, numbered air force, major command, joint commands and at the Air Staff. The federal administrative law matters were wide in scope and included compliance with the APA, FOIA, Privacy Act, HIPAA, FTCA, USERRA, Civil Service Reform Act of 1978 (CSRA), Civil Rights Act of 1964 (Title VII), Equal Employment Opportunity Act of 1972, Americans with Disabilities Act of 1990 (ADA), Age Discrimination in Employment Act of 1967 (ADEA), and the National Security Act of 1947 as amended by the Intelligence Reform and Terrorism Prevention Act (IRTPA) of 2004. I assured command compliance within the hierarchy of statutes and the regulations, Department of Defense (DoD), Joint Staff, and USAF directives and policy implemented in furtherance of statutory guidance consistent with federal court decisions and as appropriate, state laws and regulations. I have served as an expert consultant twice on matters before a federal court. I was qualified as an expert witness once in federal court prior to this matter and have testified in trial and by deposition once in the past four years.

7.      I attended the University of Georgia (UGA), Athens, Georgia from 1979 to 1983. I received a Bachelor of Arts Degree in History (Magna Cum Laude) in 1983 from UGA. I attended law school at UGA from 1983 to 1986. I earned a Juris Doctor Degree in 1986 from UGA. I attended The Judge Advocate General's Legal Center and School, Charlottesville, VA from 1997 to 1998 where I earned a Master of Laws Degree in 1998 from that institution. I attended the Eisenhower School of the National Defense University (NDU), Washington, DC from 2005 to 2006. I received a Master of Science Degree in National Resource Strategy in 2006 from NDU.

8.      I have been a member in continuous good standing of the State Bar of Georgia since 1986. I am admitted to practice before the Superior Court of Glynn County, Georgia, the Supreme Court of the State of Georgia, the US Court of Appeals for the Armed Forces, the US Court of Appeals for the Federal Circuit, and the Supreme Court of the United States of America.

9.      Based upon my background, experience and education including experience in federal administrative law and its application with regard to the United States federal agencies, to include the VA, I consider myself experienced in the effect, application and impact and  of federal law, VA and Veterans Health Administration (VHA) Directives, Memoranda and other VA and VHA issued documents as they apply under the circumstances and facts of this case.

10.     I was provided a copy of the First Amended Complaints (FAC) filed by the Plaintiffs, a copy of the Plaintiff's Notice of Taking Deposition of Defendant dated  with Exhibits A – D, a copy of the Declaration of Ms. Stephania Griffin, dated 30 May 2024 (Case Document 137-1);  a copy of the deposition of Almon Bundy (deposition transcript, dated January 10 and 11, 2024); and a copy of the deposition of Sandy Ann Folker, Ph.D. (deposition transcript, dated July 10, 2024), and associated exhibits from these depositions. I have also reviewed the mental health records of Albert Wong and the associated California Highway Patrol (CHP) Report.

11.     Based on the information I have reviewed, and based upon my training, education and experience it is my opinion that VHA employees do not retain authority to exercise discretion under VHA Directives to disclose a veteran's personally identifiable information (PII) and/or protected health information (PHI) where such disclosure is mandated under VHA Directives, VA Directives, federal regulations, federal statutes or federal case law. Instead, nondiscretionary, mandated disclosure must occur to protect VHA's federal employees and VHA patients in cases of known serious incidents that threaten public safety, such as a credible homicidal statement or gesture. That is the case here pursuant to Directive 2012-026 and consistent with VHA Directive 1605.01, para 2d and para 3 yy which require disclosure of PII and PHI when required by law.

12.     The mandatory reporting component of  Directive 2012-026 was clear. It was intended to instruct VA employees that there was no conflict with HIPAA or other privacy laws and that

information disclosure was mandatory where actual or possible violations of criminal law or public safety incidents were at issue.

13.     Directive 1605.01 often provides that the VA "may disclose" individually identifiable health information in a variety of contexts including to prevent or lessen a serious and imminent threat to the safety of an individual or the public as long as the disclosure is to a party in a position to prevent or lessen the threat such as a law enforcement official (45 CFR 164.512(j)(1)(i); upon a showing of compelling circumstances affecting the health or safety of any individual (5 USC 552a(b)(8) or to avert a serious threat to the safety of the public (45 CFR 164.512(k)(2). Although Directive 1605.01 used the term 'may' it is intended to release the VA from the confines of privacy law requirements when a Veteran makes a serious threat to health and safety of others. The "Privacy Fact Sheet" at Exhibit F to Stephania Griffin's declaration summarizes those scenarios. The disclosure in these circumstances is not discretionary; rather, it is pursuant to mandatory reporting policy and directives. The VA did not intend to allow privacy laws to take precedence over serious threats to health and safety of individuals. VA Directives, policy and scheme cannot be read in a vacuum--they must be read together. The Privacy requirements must be read in conjunction with mandatory Directives such as 2012-026 and the aforementioned statutes and regulations.

14.     Furthermore, HIPAA requirements coincide with and contemplate VA mandatory reporting directives such as VHA Directive 2012-026 that specifically allows for disclosure of otherwise protected and private information where disclosure is necessary to avert criminal behavior likely to cause injury. VHA Directive 2012-06, para 4f(11)(b) and Atch A paras 1 & 2.

15.     Other laws allow the VA to disclose PHI where circumstances require that disclosure. These include 45 CFR 164.512(j)(1)(i) and 5 USC 552a(b)(3), (8) upon a showing of a serious and imminent

threat or compelling circumstances affecting health or safety of any individual, among others. When these circumstances arise, the VA does not have the discretion to not report.

16.     Federal law is not preempted under the facts of the Wong murders. The VA Directives and CFR provisions make it clear that Federal law requires mandatory reporting to law enforcement of criminal activity where an identifiable target is known. Federal law appears to parallel California Civil Code Section 43.92, regarding mandatory reporting of homicidal threats against a specific person.

17.     Based on my review of the aforementioned documents, I understand that the Loeber Plaintiffs and the Golick Plaintiffs each filed a Tort Claim and then a Federal Court lawsuit pursuant to the Federal Tort Claims Act arising out of three murders committed by Albert Cheung Wong on March 9, 2018 at The Pathway Home on the campus of the Veterans Home of California in Yountville, California. Mr. Wong was a veteran of the U.S. Army.

18.     Based on the information available to me, I understand The Pathway Home (TPH) was a medical treatment facility authorized pursuant to a Memorandum of Agreement (MOA) with the Veterans Health Administration (VHA) to treat U.S. military veterans and therefore qualified as a VHA Facility as defined at VHA DIRECTIVE 2012-026 (Sep 2012), para 2(c)(7) which states: "A VHA facility is any location of the Department, as well as any location that hosts VHA-sponsored programs that provide care, including: VHA medical facilities, outpatient clinics, contracted sites, State Veterans Homes, residential treatment programs, community living centers, and mental health residential rehabilitation treatment programs including domiciliaries. For purposes of reporting …, tracking, and trending, a VHA facility includes any location where a VHA employee is performing official duties."

19.     Based on the information provided to me, Mr. Wong received assistance and medical treatment and care from U.S. Department of Veterans Affairs (VA) San Francisco VA before he shot and killed three people on the grounds of TPH on March 9, 2018. That assistance came both

through therapists and mental health care providers and by way of United States VA employed Peer Specialist Almon Bundy. Mr. Bundy is not a health care provider as defined by California Civil Code section 3333.2(j)1.

20.    Since the shooting by Mr. Wong at The Pathway Home occurred on March 9, 2018, the VA and subordinate VHA were subject to federal laws, implementing regulations and guidance in effect at that time. Similarly, VA policy guidance, often found in statutes or agency implementing regulations or directives in effect on March 9, 2018, also applied to VA employees responsible for patient protection, employee protection, and public safety.

21.    Relevant legal authorities regarding reporting to law enforcement and others, applicable to the VA and VHA on March 9, 2018 include but are not limited to those set forth in footnote 1.[1]

---

[1] (a) 38 U.S.C. § 902, Enforcement and arrest authority of Department police officers; (b) 38 U.S.C. § 1709, as amended by Public Law 112-154;  (c) 38 U.S.C. § 5701, Confidential nature of claims; (d) 38 U.S.C. § 5705, Confidentiality of medical quality-assurance records;  (e) 38 U.S.C. § 7332, Confidentiality of certain medical records; (f)  5 U.S.C. App. § 3, Appointment of Inspector General; (g) Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. § 651 et seq.; (h) Administrative Procedures Act, 5 U.S.C. § 551; (i) Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. 104-191; (j) Freedom of Information Act (FOIA), 5 U.S.C. § 552, Public information; agency rules, opinions, orders, records, and proceedings; (k) Privacy Act, 5 U.S.C. § 552a, Records maintained on individuals; (l) 29 CFR 1904.39(a)(1), (m) 29 CFR 1960.8a ("The head of each agency shall furnish to each employee employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm.:); (n) 38 CFR 17.107, VA Response to Disruptive Behavior of Patients (2010);  (o) 38 CFR 1.201, Employee's Duty to Report (2003) (citing as authority: 5 U.S.C. App. § 3, 38 U.S.C. § 902. (p) 38 CFR 1.203, Information to be reported to VA Police (2003) (citing as authority: 38 U.S.C. § 902.); (q) 38 CFR 1.204 Information to be reported to the Office of the Inspector General (2003); (r) 38 CFR 1.218, Security and Law Enforcement; (s) 45 CFR, Parts 160, 162 and 164 (implements HIPAA Section 13400 and 13423 Subtitle D - Privacy);  (t)  VA Directive 0321, Serious Incident Reports, January 21, 2010;  (u) VA Directive 6502, *VA Enterprise Privacy Program*, May 5, 2008 (accessed online at: https://www.va.gov/vapubs/Search_action.cfm); (v) VA Under Secretary for Health, *Validity of VHA Policy Document*, Memorandum. June 29, 2016 (wherein the Under Secretary mandated "…continued use of and adherence to VHA policy documents beyond their recertification date until the policy is rescinded, recertified, or superseded by a more recent policy or guidance"); (w) VHA Directive 1605.01, Privacy and Release of Information; (x) VHA Directive 1605.01, Privacy and Release of Information, dated August 31, 2016 (rescinded July 24, 2023); (y) VHA Directive 2010-053, *Patient Record Flags*, December 3, 2010 (corrected copy February 3, 2011) (expired December 31, 2015);  (z) VHA Directive 2010-008, *Standards for Mental Health Coverage in*

22.     The VHA administers a patient privacy program pursuant to federal law, VA directives, guidelines, and policies as well as internal VHA directives, guidelines and policies. In general terms, there are limitations on the release of patient information, such as personally identifiable information (PII) and protected health information (PHI).  However, disclosure of PII and/or PHI exist under two important categories: under discretionary guidelines and under mandatory, nondiscretionary, authorities set out in statute and in VA and VHA guidance and policy. These mandatory disclosure exceptions primarily exist under public health, patient and employee safety, and law enforcement guidelines.

23.     VHA Directive 2012-026, "establishes a unified policy describing the management of all individuals in VHA facilities whose behavior has, or could, jeopardize the health or safety of others, undermine a culture of safety in VHA, or otherwise interfere with the delivery of health care at the facility. It implements the provisions of Public Law (Pub. L.) 112-154, section 106, by ensuring that behaviors which undermine a safe and healing environment are appropriately reported, addressed, and monitored."

   a)   VHA Directive 2012-026 at para 2(a) states, "VHA is committed to reducing and
        preventing disruptive behaviors and other defined acts that threaten public safety
        through the development of policy, programs, and initiatives aimed at patient, visitor,
        and employee safety. In addition, Pub. L. 112-154, section 106, directed the Department
        of Veterans Affairs (VA) to develop and implement a comprehensive policy on the
        reporting and tracking of sexual assault incidents and other public safety incidents that
        occur at each medical facility of the Department."

---

*Emergency Departments and Urgent Care Clinics in VHA Facilities*;  (aa) VHA Directive 2012-026, *Sexual Assaults and Other Defined Public Safety Incidents in Veterans Health Administration (VHA) Facilities*, September 27, 2012 (recinded September 12, 2022); (bb) VHA Directive 6330(1), Controlled National Policy/Directives Management System, June 24, 2016, amended January 11, 2017; (cc) OSHA Guidelines 3148-01R 2004, *Guidelines for Preventing Workplace Violence for Health Care and Social Service Workers*; (dd)Environment of Care Guidebook, The Joint Commission on the Accreditation of Healthcare Organizations (JCAHO), 2004; (ee) VA Handbook 0322.1, *VA Integrated Operations Center (VAIOC)*; (ff) VA Handbook 0730, Security and Law Enforcement; (gg) VHA Handbook 1050.01, *VHA National Patient Safety Improvement Handbook*; (hh) VHA Handbook 1605.02, *Minimum Necessary Standard for Protected Health Information*; and, (ii) VHA Handbook 1605.03, Privacy Compliance Assurance Program and Privacy Compliance Monitoring.

DECLARATION OF YOUNGNER IN OPPOSITION TO DEFENDANT USA'S MOTION TO DISMISS
CASE NO.: 3:21-CV-03866-LB

b)  VHA Directive 2012-026 states at para 2(b), "(t)his Directive is consistent with VHA's longstanding commitment to public safety, achieved through evidence-based approaches addressing employee-generated behavior(s), patient-generated behavior(s), employee education, incident reporting (see Att. A) and tracking, and environmental design**.** All acts that jeopardize public safety compromise the VHA patient care mission and they are well-recognized concerns of patients, families, employees, and others."

c)  VHA Directive 2012-026 at para. 2(c)(3) defines Public Safety Incidents as, "(a) Criminal and purposefully unsafe acts. (b) Disruptive or violent behavior(s) that undermine a culture of safety. (c) Any kind of event involving alleged or suspected abuse of a patient or other individual in a VHA facility. (d) Acts related to alcohol or substance abuse by an individual in a VHA facility. These acts pertain to sexual assaults, sexual assault incidents, and/or public safety incidents and the concurrent use of alcohol and/or substances."

d)  VHA Directive 2012-026 at para. 2(c)(4) defines Disruptive Behavior as "behavior by any individual that is intimidating, threatening, dangerous, or that has, or could, jeopardize the health or safety of patients, Department of Veterans Affairs (VA) employees, or individuals at the facility. Disruptive behavior is behavior that interferes with the delivery of safe medical care to patients at the facility, or behavior that impedes the operations of the facility. Disruptive behavior does not depend upon the disruptive individual's stated intentionality or justification for the individual's behavior, the presence of psychological or physical impairment, whether the individual has decision-making capacity, or whether the individual later expresses remorse or an apology."

24.  The VHA implemented a Disruptive Behavior Committee (DBC) or Disruptive Behavior Board (DBB) construct to address disruptive behaviors in the medical workplace setting. "A DBC or DBB is a facility-level, interdisciplinary committee whose primary charge is using evidence-based and data-driven practices for preventing, identifying, assessing, managing, reducing, and tracking patient-generated disruptive behavior." VHA Directive 2012-026, para. 2c(8).

25.  VHA Directive 2012-026, Attachment A, mandates nondiscretionary reporting requirements: "**All employees of the Veterans Health Administration (VHA) are required to report** sexual assaults and **public safety incidents to supervisory personnel. Supervisory personnel must inform law enforcement officials, and VHA facility leadership. VHA facility leadership must in turn notify the Veterans Integrated Service Network (VISN) and Department of Veterans Affairs (VA)**, to include the VA Integrated Operations Center in accordance with national policy (i.e., VHA National Patient Safety Improvement Handbook, 1050.01, VA Directive 0321, Serious Incident Reports). All allegations of sexual assault that meet the description in Notification of

Serious/Emergent Incidents must be reported within 2 hours. **All VA employees with knowledge of or information about actual or possible violations of criminal law related to VA programs, operations, facilities, contracts, or information technology systems must immediately report such knowledge or information to their supervisor, any management official, or directly to the Office of Inspector General** as directed by title 38 Code of Federal Regulations (CFR) 1.201" (emphasis added).

26.     VHA Directive 2012-026, Attachment A also states, "**Information about actual or possible violations of criminal laws related to VA programs, operations, facilities, or involving VA employees, where the violation of criminal law occurs on VA premises, must be reported by VA management officials to the VA police component with responsibility for the VA station or facility in question**. If there is no VA police component with jurisdiction over the offense, the information must be reported to Federal, state or local law enforcement officials, as appropriate, according to 38 CFR 1.203" (emphasis added).

27.     Another mandatory reporting authority is VHA Directive 1605.01, which provides for release of PHI when **required by law** (emphasis added). This Directive states, "**Required by Law.** For purposes of this policy, required by law means a mandate contained in Federal, State, local or tribal law and enforceable under the law that compels an entity to collect, create, use or disclose PHI. This includes, but is not limited to, disclosures under FOIA, court orders, court-ordered warrants and summonses issued by a governmental or tribal inspector general." VHA Directive 1605.01, para. 41ww (emphasis in cited document).

28.     A final example of authority for VHA's mandatory disclosure of patient information exists at 38 U.S.C. § 5701(b) which details six independent situations where the VHA must release information pursuant to a claim. Particularly "(w)hen required by any department or other agency of the United States Government." 38 U.S.C. § 5701(b)(3).

29.     The Occupational Safety and Health (OSH) Act of 1980 applies to the VHA facilities and VA employees and all federal agencies under Section 19 of the OSH Act. Federal agency heads, to include the Secretary of the VA and the Executive Director of the VHA are responsible for providing safe and healthful working conditions their federal employees. *See*, 29 CFR 1960.8(c).

30.     The head of each agency shall develop, implement, and evaluate an occupational safety and health program in accordance with the requirements of section 19 of the Act, Executive Order 12196, and the basic program elements prescribed in this part, or approved alternate program elements.

31.     A Serious Violation Notice was issued by the OSHA to U.S. Department of Veterans Affairs – San Francisco Medical Center as authorized by 29 CFR 1960.8(a), which determined the VA "did not furnish employment and a place of employment to each employee that were free from recognized hazards that caused or were likely to cause death or serious physical harm in that employees were exposed to hazard of being assaulted by patients."

32.     The OSHA Serious Violation Notice also determined that, "(o)n or about March 9, 2018, employees at the Pathway Home in Yountville, CA were exposed to assaults while working with patents making physical threats to employees. **An adequate workplace violence program had not been implemented**. On March 9, 2018, an employee was fatally shot by a patient who had a history of homicidal and suicidal ideation" (emphasis added).

33.     The San Francisco VA Medical Center received a second OSHA Violation Notice for an Other-than-Serious Violation for the occurrence of an employee fatality which "was not reported to OSHA within 8 hours" as required by 29 CFR 1904.39(a)(1).

34.     OSHA and the San Francisco VA Medical Center signed an Informal Settlement Agreement concerning the Violations on October 19, 2018. This agreement stated in part: "1) The Employer

(US Department of Veterans Affairs) agrees to correct the violations as cited in the citations or as amended below." The violations that the VA acceded to were as follows:

1) Implement protocols for reporting patients who make physical threats to employees to the (DBC). Train all staff on these protocols.

2) Require off-site providers to inform VA if there are any patients who make physical threats to VA employees.

3) Provide off-site providers with policies and procedures for communicating and requesting DBC assistance to address incidents of workplace violence and potential workplace violence.

4) Required DBC to timely respond to actual and potential incidents of workplace violence were ever VA employees are working by providing steps to protect employees.

5) Require the Suicidal Prevention Team to refer any patients who make physical threats to employees to the DBC

6) implement protocols to flag patients charts for actual and potential violence promptly after incidents occur.

7) Require outside providers address employee safety with regards to workplace violence.

8) Implement procedures for reviewing all incidents of workplace violence including threats and near misses.

9) Enhance current training by assessing the content and frequency of training. Ensure updated training include active shooter and body mechanics training.

35. The actual Informal Settlement Agreement had eight components:

(a) "**Ensure all employees on-site and off-site are periodically trained in and understand protocols for reporting patients who make physical threats to employees to the Disruptive Behavior Committee**" (DBC)(Emphasis added). "Employ other methods including on and off-site workplace signage and periodic emails to all staff reinforcing the protocols. Include host employers and community based outreach centers in the distribution of the information";

(b) "**Ensure that the DBC responds promptly to actual and potential reports of workplace violence wherever VA employees are working, and that the DBC monitors and tracks the response to the reports**" (emphasis added);

(c) "**Ensure that the DBC identify** and [*sic*] **the types of reports of workplace violence which require an immediate response**" (emphasis added);

(d) "Reinforce existing protocols which require the Suicide Prevention Team to

report threats to staff to the DBC. This could be done through frequent training, email reminders and workplace signage";

(e) "**Ensure all VA employees have a mechanism to immediately communicate actual or threats of workplace violence to all employees who may come into contact with the patient**" (emphasis added);

(f) "Review existing workplace violence prevention policies where available for all VA employees working at contractor sites. Assess existing engineering and administrative controls and ensure controls are put in place through contract language where applicable. Where possible when working with outside providers, consider including contract language that addresses employee safety and physical security";

(g) "Require the VA to review and approve outside providers workplace violence prevention programs, prior to any VA employees working on their site. Such a review should include an assessment of the engineering and administrative controls put in place to reduce or eliminate injuries from workplace violence"; and,

(h) "Enhance current training by assessing the content and frequency of training. Ensure updated trainings include active shooter and body mechanics training."

36.     Based on the information provided to me, Dr. Sandy A. Folker, Ph.D., a VA Workplace Violence Prevention Program Manager, was deposed in this case as a designated agency representative (30(b)6 witness). Dr. Folker discussed important roles of the VHA's Disruptive Behavior Reporting System (DBRS) and the DBC within VA medical facilities.

37.     Dr. Folker agreed that the "Disruptive Behavior Reporting System, that's a VA-approved, secure, web-based reporting mechanism providing means for all VA employees to alert the DBC about behaviors that could cause a safety concern" Folker Transcript, p.33, line 3.  *See* Ex. A.

38.     Dr. Folker stated, "the DBRS is one of many platforms to report, but the individuals that oversee the DBRS may or may not be your supervisors, and the DBC is not an emergent response team. So we would want people to -- especially if this is information about a violation of criminal law, to report that to their supervisors in alignment with our privacy policy." Folker Transcript, p. 42, lines 10-16.  *See* Ex. A.

39.     Dr. Folker described a mandatory reporting requirement in VA facilities outside of the DBRS stating VA employees "would still need to inform their supervisor and management of

anything that was a legal violation or, as it states in here, information about actual or possible violations of criminal law related to the VA programs. So a report to the DBRS system in and of itself would not meet that requirement." Folker Transcript, p. 41, lines 8-14. *See* Ex. A.

40.     Concerning the San Francisco VA Medical Center OSHA Violation from 2018, Dr. Folker was asked, "Were there protocols in place prior to the shootings in this case for reporting patients who made physical threats to employees?" She replied "They were. They appeared to agree to do things that they were already doing." Folker Transcript, p. 76, lines 3-7. *See* Ex. A.

41.     When asked about the facilities and employees covered by VHA Directive 2012-026, Dr. Folker stated, "this policy is with the intention of instructing VHA employees when we recommend that they report, and what we are indicating in this is that anywhere that you are working in your capacity as a VHA employee, a VHA employee, we are asking that they report."

42.     Dr. Folker specifically discussed the applicability of VHA Directive 2012-026 as it related to The Pathway Home stating, "VHA employees that are providing services offsite, off of federal owned and governed entities, in which the same reporting practices apply regardless of where a VHA employee is providing care. So if we're providing care at a college, if we're providing care at the Pathway House [*sic*], if we're providing care at a CBOC, it's the same as if we were providing care at our main site." Folker Transcript p. 88, line 21 – p. 89, line 3. *See* Ex. A.

43.     Dr. Folker agreed with the statement that VHA Directive 2012-026 "was in effect at least in 2012, correct?" She answered, "I do understand this was in effect in 2012." She also agreed that "some version of it existed in 2018 at the time of the shooting." Dr. Folker said, "That is a fair statement, yes." Folker Transcript, p. 194, lines 17-24. *See* Ex. A.

44.     Dr. Folker expressed no knowledge of awareness that in VA OIG Report from January 2018, two expired VHA Directives, VHA Directive 2012-026 and VHA Directive 2010-053, *Patient Record Flags*, the VA Office of the Inspector General (OIG) "considered these policies to be in effect

as they had not been superseded by more recent policy or guidance. In a June 29, 2016, memorandum to supplement policy provided by VHA Directive 6330(1),12 the VA Under Secretary for Health mandated the '…continued use of and adherence to VHA policy documents beyond their recertification date until the policy is rescinded, recertified, or superseded by a more recent policy or guidance.' The Under Secretary for Health also tasked the Principal Deputy Under Secretary for Health and Deputy Under Secretaries for Health with ensuring '…the timely rescission or recertification of policy documents over which their program offices have primary responsibility.'" VA OIG Report No. 17-04460-84, Combined Assessment Program Summary Report, *Management of Disruptive and Violent Behavior in Veterans Health Administration Facilities*, January 30, 2018.

45.     Finally, Dr. Folker stated, the "DBC, as a safety consultation team, is not charged with reporting to the police. The police are on the DBC. **If the DBC were to receive a report and it would be something that clearly indicated a direct threat, an imminent serious risk and we, upon review, discovered that it had not been to the -- brought to the attention of police, we would then do so. It would be best practice to do so.** But by the nature of how the team operates, it would be -- it wouldn't be the first party to be privy to the information. **If it was serious or imminent, ideally the police would be notified first**" (emphasis added).

I declare under penalty of perjury under the laws of the United States of America and in accordance with 28 U.S.C. 1746 that the foregoing is true and correct. Executed this 31st day of July, 2024, at Cape Coral, Florida.

_____
LARRY D. YOUNGNER, Colonel, USAF (Ret.)

1

**PROOF OF SERVICE**

2

    I, Brittany Rogers, am employed in the County of San Francisco, State of California. I am over
3
the age of eighteen years and not a party to the within action; my business address is 425 California
Street, Suite 900, San Francisco, California, 94104.
4

5
I served the foregoing document(s) described as the following:

6

**DECLARATION OF LARRY D. YOUNGNER IN OPPOSITION TO DEFENDANT**
7
**UNITED STATES OF AMERICA'S MOTION TO DISMISS**

8

9
[X]     by placing the original [X] true copy(ies) thereof enclosed in sealed envelopes addressed as
follows:

10

11
[ ]     **BY ELECTRONIC SERVICE/NEF**: Service was accomplished through the Notice of
Electronic Filing for parties and counsel who are registered ECF Users.

12

13
[ ]     **BY PERSONAL SERVICE**:  I caused such envelopes to be delivered by hand this date to
the persons listed below:

14
[ X ]     **EMAIL-FRCP 5(b)(2)(E)** pursuant to written consent to service by electronic means by
15
placing in a secure email in accordance with this office's practice, and addressed to the party's last
known email address listed below:

16

17
    I declare under penalty of perjury that the foregoing is true and correct.  Executed on August
1, 2024 in San Francisco, California.
18

19
    _____/s/ Brittany Rogers_____
    *Brittany Rogers*
20

21

22

23

24

25

26

27

28

1

## SERVICE LIST

2

STEPHANIE M. HINDS (CABN 154284)

3
United States Attorney
MICHELLE LO (NYRN 4325163)

4
Chief, Civil Division
DOUGLAS JOHNS (CABN 314798)

5
Assistant United States Attorney
150 Almaden Boulevard, Suite 900

6
San Jose, California 95113

7
Telephone: (415) 846-8947
FAX: (408) 535-5081

8
Douglas.Johns@usdoj.gov
**Attorneys for Defendant**

9
**UNITED STATES OF AMERICA**

10

Ronald Foreman, Esq.

11
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300

12
San Francisco, CA 94133
Tel: (415) 433-3475

13
Fax: (415) 781-8030

14
Email: foremanandbrasso@foremanandbrasso.com
rdf@foremanandbrasso.com

15
polly@foremanandbrasso.com
iah@foremanandbrasso.com

16
**Attorney for Plaintiffs**

17
**MARC GOLICK**

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF YOUNGNER IN OPPOSITION TO DEFENDANT USA'S MOTION TO DISMISS
CASE NO.: 3:21-CV-03866-LB

# Exhibit A

# Deposition Transcript

Case Number: 3:21-CV-03870-LB
Date: July 10, 2024

In the matter of:

# GOLICK, et al. v UNITED STATES OF AMERICA

# Sandy Folker, PhD

**CERTIFIED COPY**

Reported by:
CYNTHIA F. DAMMANN



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4                      - - -

 5   MARC GOLICK individually;   )
     and M.G. by and through     )
 6   her guardian ad litem       )
     MARC GOLICK,                )
 7                               )
             Plaintiff,          )
 8                               )
       v.                        )  NO. 3:21-CV-03870-LB
 9                               )
     UNITED STATES OF AMERICA,   )
10                               )
             Defendant.          )
11   - - - - - - - - - - - - - -

12

13

14

15              Video-recorded deposition of SANDY

16   FOLKER, PhD, taken on behalf of Plaintiff, at 850

17   Montgomery Street, Suite 300, San Francisco,

18   California, commencing at 11:16 a.m., WEDNESDAY,

19   JULY 10, 2024, before Cynthia F. Dammann, Certified

20   Shorthand Reporter No. 10610, pursuant to Notice.

21

22

23

24

25
```

```
 1                   SAN FRANCISCO, CALIFORNIA

 2              WEDNESDAY, JULY 10, 2024; 10:13 A.M.

 3

 4              MR. HANSEN:  So we're on the record.  This

 5   is Ian Hansen of Foreman & Brasso.  I represent the

 6   Golick plaintiffs.  It's 10:13.  I just received

 7   word that the videographer's car was broken into and

 8   so he's running late.  I was told that he'll be here

 9   in about 15 to 20 minutes.  My -- I apologize to the

10   parties for the inconvenience.  I'm requesting that

11   we come back in about half an hour -- that will be

12   around 10:45 -- to begin the deposition.  I've said

13   that I do not expect this deposition to run past

14   3:00 p.m. regardless of this issue.

15              MR. JOHNS:  Good morning.  Doug Johns for

16   defendant, the United States of America.  I'm

17   representing Dr. Folker here today.  Dr. Folker and

18   I were present at 10:00 o'clock, which is the

19   noticed time for the deposition, at the law firm of

20   Forearm & Brasso.

21              We will come back, but we are counting this

22   time as on the record starting at 10:00 o'clock.

23   This is the second time where there's been

24   administrative problems with the videographer and

25   logistical issues.  Thank you.
```

10:12:34 (line 5)
10:12:48 (line 10)
10:13:01 (line 15)
10:13:14 (line 20)
10:13:26 (line 25)

SANDY FOLKER, PHD
JULY 10, 2024

JOB NO. 1069702

1   experiencing whatever words or actions the

2   individual was engaging in.

3       Q.  All right.  During the time period from 2012

4   to 2018, did the VA distinguish between

11:43:02   5   patient-generated disruptive behavior and other

6   types of disruptive behavior?

7       A.  Yes.

8       Q.  Can you explain what that distinction was?

9       A.  The -- any behavior that is done by an

11:43:13  10   individual who is, in essence -- the way I like to

11   think about it -- getting paid for their time, so

12   i.e. a VA employee, gets routed to a different team

13   called the Employee Threat Assessment Team, ETAT.

14   It is all done through the same reporting system,

11:43:27  15   the Disruptive Behavior Reporting System, the DBRS.

16       So when somebody files a report, if they

17   indicate that the individual engaging in the

18   behavior was a veteran patient, it would be routed

19   to the DBC.  If they indicated that the individual

11:43:42  20   engaging in the behavior was a staff member, it

21   would be routed to the Employee Threat Assessment

22   Team, the ETAT.

23       Q.  Okay.  And the Disruptive Behavior Reporting

24   System, that's a VA-approved, secure, web-based

11:43:58  25   reporting mechanism providing means for all VA

1  employees to alert the DBC about behaviors that

2  could cause a safety concern, correct?

3       A.  Correct.

4       Q.  And the main purpose of the DBRS is to serve

11:44:21   5  as a tool to promote a safe environment for

6  patients, VA staff, and visitors, correct?

7            (Court reporter clarification.)

8            MR. JOHNS:  Objection, form, speculation,

9  foundation.

11:44:34   10           THE WITNESS:  The DBRS system is intended to

11  be kind of a see-something/say-something system.  It

12  is to ensure that anybody who subjectively

13  experiences something as threatening or potentially

14  interfering, right, disruptive with their ability to

11:44:50   15  provide care to a veteran has an avenue and platform

16  to report it into our team so we can then review it

17  and determine whether or not it is something that is

18  a safety concern and provide risk mitigating

19  interventions if so.

11:45:02   20  BY MR. HANSEN:

21       Q.  And --

22       A.  Or provide recommendations for risk

23  mitigating interventions if so.

24       Q.  And employees then are encouraged to report

11:45:10   25  any safety concerns through this DBRS system,

1    Disruptive Behavior Reporting System that it enables

2    the VA employees to meet that requirement with

3    respect to the mandatory reporting of acts of

4    violence in the workplace?

11:52:58    5         MR. JOHNS:  Objection, form, beyond the

6    scope, vague.

7         THE WITNESS:  No.  It would be separate from

8    that.  They would still need to inform their

9    supervisor and management of anything that was a

11:53:09   10    legal violation or, as it states in here,

11    information about actual or possible violations of

12    criminal law related to the VA programs.  So a

13    report to the DBRS system in and of itself would not

14    meet that requirement.

11:53:23   15    BY MR. HANSEN:

16         Q.  Well, so I guess my question is -- and I

17    think it's -- your answer is slightly different than

18    my question.

19         My question is, is one of the functionality

11:53:34   20    requirements of the reporting system that it enables

21    VA employees to meet that requirement?

22         MR. JOHNS:  Objection, form, foundation,

23    speculation, vague, beyond the scope.

24         THE WITNESS:  Yeah.  I don't have a

11:53:44   25    different answer.  Maybe you can ask it in a

1  different way if there's something else that you're

2  intending to ask.

3  BY MR. HANSEN:

4      Q.  Well, I'm just -- from what I understand,

11:53:53  5  your answer was you can report through the DBRS to

6  meet that requirement, correct?

7          MR. JOHNS:  Objection, form, misstates

8  testimony.

9          THE WITNESS:  That's not what I said.  And

11:54:07  10  so the DBRS is one of many platforms to report, but

11  the individuals that oversee the DBRS may or may not

12  be your supervisors, and the DBC is not an emergent

13  response team.  So we would want people to --

14  especially if this is information about a violation

11:54:24  15  of criminal law, to report that to their supervisors

16  in alignment with our privacy policy.

17  BY MR. HANSEN:

18      Q.  Okay.  So -- so your testimony is then that

19  no, that the Disruptive Behavior Reporting System is

11:54:38  20  not a method for allowing VA employees to meet the

21  requirements of 38 CFR § 1.201?

22      A.  There are multiple ways to meet that

23  requirement.  We would want them to speak to their

24  supervisor, and we encourage them to report to the

11:54:52  25  DBRS.

1    Q.   Number one.

2    A.   -- correct?  Yes, I see that.

3    Q.   Were there protocols in place prior to the

4  shootings in this case for reporting patients who

12:41:16    5  made physical threats to employees?

6    A.   They were.  They appeared to agree to do

7  things that they were already doing.

8    Q.   Okay.  And then number two, it says,

9  "Require off-site providers to inform VA if there

12:41:27   10  are any patients who make physical threats to VA

11  employees."

12         Was that already in place, that requirement,

13  prior to the shootings in this case?

14    A.   Yeah.  As I already discussed, all VA

12:41:36   15  employees are governed by the same policy.  So

16  whether they're onsite or offsite or at CBOCs, it

17  would apply, so yes.

18    Q.   And do you know if in this specific case the

19  Pathway House was required to inform the VA if there

12:41:51   20  are any patients who made physical threats to VA

21  employees?

22    A.   As in a non-VA employee of the Pathway

23  House?  Is that the question?

24    Q.   Right.

12:41:59   25    A.   We don't have the ability to govern the

SANDY FOLKER, PHD                                          JOB NO. 1069702
JULY 10, 2024

```
         1   VA employees are working by providing steps to
         2   protect employees."
         3          Do you see that?
         4      A.  I do see that.
12:54:11 5      Q.  And that was already in effect at the time
         6   of these shootings, correct?
         7      A.  Correct.
         8      Q.  And number 3 states, "Provide off-site
         9   providers with policies and procedures for
12:54:24 10  communicating and requesting DBC assistance to
         11  address incidents of workplace violence and
         12  potential workplace violence."
         13         Do you see that?
         14     A.  I do.
12:54:33 15     Q.  And that was already in effect at the time
         16  of these shootings, correct?
         17     A.  I have a general awareness that the Pathway
         18  House and the VA did have an agreement already in
         19  this regard.  And "off-site providers" in this
12:54:51 20  capacity is vague.
         21         What I interpret this to be as is VHA
         22  employees that are providing services offsite, off
         23  of federal owned and governed entities, in which the
         24  same reporting practices apply regardless of where a
12:55:08 25  VHA employee is providing care.  So if we're
```

1  providing care at a college, if we're providing care

2  at the Pathway House, if we're providing care at a

3  CBOC, it's the same as if we were providing care at

4  our main site.

12:55:22  5      Q.  So if you turn to page 64406, you see

6  someone's -- there's a signature for the employer.

7          Do you see that?

8      A.  Yes.  The signature appears to be Bonnie

9  Graham, who was the director at the time.

12:55:44  10      Q.  Okay.  And you did not attempt to speak with

11  Bonnie Graham prior to today's deposition, correct?

12      A.  Correct.

13      Q.  Now, if you look at 64404(c), as part of the

14  informal settlement agreement the -- OSHA agreed to

12:56:47  15  recommend -- to amend the recommended corrective

16  action language to state "ensure that the DBC

17  identify and the types of reports of workplace

18  violence which require an immediate response."

19          Do you see that?

12:57:01  20      A.  I do see that.

21      Q.  Prior to the killings in this case, had the

22  DBC identified the types of reports of workplace

23  violence that required an immediate response?

24      A.  Earlier when we were talking about who gets

12:57:15  25  the alerts for the DBRS system, that alert that goes

```
      1  policies.  But generally speaking, I'm aware that

      2  there is policy around sexual assaults and other

      3  public incidents that is a VHA directive.

      4     Q.  Okay.  And this is a document -- this is a

15:57:08  5  document, as you said, that's been updated.

      6        Do they update these things every year, or

      7  what do they do?  What's the process?

      8     A.  I --

      9        MR. JOHNS:  Objection, form, beyond the

15:57:17 10  scope.

     11        THE WITNESS:  Yeah.  I don't know how often.

     12        MR. JOHNS:  Speculation.

     13        THE WITNESS:  I don't know if there's some

     14  kind of cadence to how often they update it.

15:57:27 15  BY MR. RIGHTHAND:

     16     Q.  Okay.  And you understand, though, that this

     17  was in effect at least in 2012, correct?

     18     A.  I do understand this was in effect in 2012.

     19     Q.  And -- and some version of it existed in

15:57:45 20  2018 at the time of the shooting.  Is that fair?

     21     A.  That is a fair statement, yes.

     22     Q.  And then it -- also, this document is not

     23  just about sexual assaults, right?

     24     A.  Correct.

15:58:00 25     Q.  I mean, it's kind of -- to me, it's a little
```

1  STATE OF CALIFORNIA        )

2  COUNTY OF SAN FRANCISCO    )

3

4              I hereby certify that the witness

5  in the foregoing deposition was by me duly sworn to

6  testify to the truth, the whole truth and nothing

7  but the truth, in the within-entitled cause; that

8  said deposition was taken at the time and place

9  herein named; that the deposition is a true record

10  of the witness's testimony as reported by me, a duly

11  certified shorthand reporter and a disinterested

12  person, and was thereafter transcribed into

13  typewriting by computer.

14              I further certify that I am not

15  interested in the outcome of the said action, nor

16  connected with, nor related to any of the parties in

17  said action, nor to their respective counsel.

18              IN WITNESS WHEREOF, I have hereunto

19  set my hand this 15th day of July, 2024.

20

21  Reading and Signing was:

22  ___ requested  ___ waived  _X_ not requested

23

24              *Cynthia F. Damman*

25              CYNTHIA F. DAMMANN, CSR No. 10610